UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MICHAEL JAMES LAYOU,

                                        Plaintiff,                    9:11-cv-00114 (BKS/DJS)

v.

DOUGLAS K. CREWS, Patrolman, Village of Phoenix
Police Department,

                                        Defendant.
_____

**APPEARANCES:**

Michael James Layou
16-B-1046
Cayuga Correctional Facility
P.O. Box 1186
Moravia, NY 13118
Plaintiff, pro se

Charles C. Spagnoli
The Law Firm of Frank W. Miller
6575 Kirkville Road
East Syracuse, NY 13057
Attorneys for Defendant

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

On September 25, 2017, this § 1983 action was dismissed by reason of settlement without prejudice to a party seeking to reopen the case within 30 days under certain conditions (Dkt. Nos. 240, 244.). Presently before the Court are Plaintiff Michael James Layou's October 19, 2017 request that the Court reopen the case because the "settlement has not been consummated" (Dkt. No. 246) and his October 27, 2017 request that the Court retain ancillary jurisdiction over the

enforcement of the settlement agreement (Dkt. No. 252, at 2). Defendant Douglas K. Crews opposes the request to reopen. (Dkt. Nos. 247, 250, 260). For the reasons discussed below, Plaintiff's requests are denied.

## II.    BACKGROUND

The Court incorporates by reference its previous rulings describing the underlying allegations and claims in this case. (*See, e.g.*, Dkt. Nos. 73, 107). The relevant facts for purposes of deciding Plaintiff's motion to reopen are as follows. On September 25, 2017, the date that trial was scheduled to commence, the parties announced in court that they had reached a settlement. (Dkt. No. 244, at 2). Defendant's counsel described the principal terms of the settlement on the record. (*Id.* at 2-3).[1] Plaintiff's counsel acknowledged that this was her understanding of the agreement, and Plaintiff did not object. (*See id.* at 3). Accordingly, the Court informed the parties that the case would be closed by reason of settlement, and that the parties could reopen the case within 30 days only if there was "some glitch in the payment or something like that" but not "to reassess the settlement." (*Id.*). No objection was made, and Plaintiff's counsel then accepted Defendant's counsel's offer to write the initial draft of the settlement agreement. (*See id.*).

Shortly after the parties' appearance on September 25, 2017, the Court issued an order of dismissal by reason of settlement, providing that the case was "dismissed and discontinued in its entirety, without costs, and without prejudice to the right of any party to reopen this action within thirty (30) days of the date of this Order if the settlement is not consummated." (Dkt. No. 240, ¶ 1).  The order of dismissal further provided that if "the parties wish for the Court to retain ancillary jurisdiction for the purpose of enforcing any settlement agreement, they must submit a request that the Court retain jurisdiction over enforcement of the agreement, or submit the

---

[1] The terms of the settlement are sealed. (Dkt. No. 241).

agreement to the Court for incorporation of its terms into an Order retaining jurisdiction, within the above referenced thirty (30) day for reopening this matter." (*Id.* ¶ 3). Finally, the order specified that the dismissal of the case would "become with prejudice on the thirty-first day following the date of this Order, unless any party moves to reopen this case within thirty (30) days of the date of this Order upon a showing that the settlement was not consummated." (*Id.* ¶ 4).

On October 16, 2017, Plaintiff's counsel filed a letter indicating that Plaintiff was "not willing to sign the settlement agreement as circulated by" Defendant's counsel. (Dkt. No. 245). Three days later, Plaintiff's counsel filed another letter stating that Plaintiff would "not agree to the terms and conditions in the settlement agreement" circulated by Defendant's counsel and requesting that the case be reopened as the "settlement has not been consummated." (Dkt. No. 246). On October 19, 2017, Defendants wrote to the Court, stating that there was "apparently no issue concerning the drafting of the settlement agreement" and that the issue was that Plaintiff "was no longer willing to settle upon the terms agreed to in court." (Dkt. No. 247, at 1). The Court held a telephonic conference with counsel on October 23, 2017, during which Plaintiff's attorney explained that her client objected to several provisions of the settlement agreement, including the release of previously dismissed defendants, Defendant's nonadmission of liability, and the agreement's confidentiality, nondisparagement, and severability clauses.[2] Plaintiff's counsel further clarified that the issue with the release of previously dismissed defendants was not with the drafting of the provision but with the inclusion of that provision into the agreement.

---

[2] At the conclusion of the telephonic conference, the Court relieved Plaintiff's attorney, Samantha C. Riggi, of her appointment as Plaintiff's pro bono trial counsel.

Defendant filed a letter on October 24, 2017 in opposition to the reopening of the case, arguing that the settlement reached in court on September 25, 2017 was binding and enforceable, that the Court had told the parties it would not reopen the case to reassess the settlement, and that the Plaintiff could not "prevent the settlement from being consummated by repudiating it" and then request the reopening of the case for failure to consummate the settlement agreement. (Dkt. No. 250).[3]

Proceeding pro se, Plaintiff subsequently filed a letter, dated October 25, 2017, "to clarify [his] position regarding the proposed Settlement Agreement" circulated by Defendant's counsel. (Dkt. No. 252, at 1). Plaintiff argued that "the circulated settlement agreement was a prejudicial, one-sided agreement, favoring defendant" because it contained a severability clause, a confidentiality clause, and a clause requiring Plaintiff "to make a false statement, by claiming he had been afforded the 'the right to consultation with legal counsel prior to executing [said] Settlement Agreement.'" (*Id.*). Further, Plaintiff stated that he had sent a letter to his counsel on September 25, 2017 objecting to "the dismissed parties being included in said Settlement Agreement," but his counsel had "failed to voice any objection to the inclusion of the dismissed parties on 9/25/2-17."[4] (*Id.*). In closing, Plaintiff asked the Court to "retain ancillary jurisdiction over this civil action until it is consummated." (Dkt. No. 252, at 2). In a follow-up letter dated October 26, 2017, Plaintiff stated that the "drafting of the settlement agreement is the sole issue preventing consummation." (Dkt. No. 256, at 1). Plaintiff averred that he would sign an

---

[3] Defendant also requested that sanctions be imposed on Plaintiff for "attempting to belatedly reject the settlement terms under the guise of a request to reopen." *Id.* at 2. Given its disposition of the case, in the exercise of its full discretion, the Court declines to impose sanctions in the present circumstances.

[4] The referenced letter to counsel was sent after the September 25, 2017 court appearance—attended by Plaintiff—at which the parties advised the Court that they had reached a settlement. (*See* Dkt. No. 252-1 (September 25, 2017 letter from Plaintiff to his counsel acknowledging that Defendant's counsel had "stated on the record that all of the previously dismissed clients and claims . . . would also be included in the terms of the Settlement")).

agreement that included a mutual nondisparagement clause, a confidentiality provision, and a full mutual release (including as to previously dismissed defendants), but reiterated his opposition to the inclusion of a severability clause and the provision concerning consultation with counsel, which he deemed to be a "false statement." (*Id.* at 1-2). In response, Defendant has offered to eliminate the two clauses and resubmit the draft to Plaintiff directly. (Dkt. No. 260, at 1).

## III.    DISCUSSION

### A.    Enforceability of Settlement Agreement

"Where the parties intend to be bound, an oral settlement of a litigation is binding even if a party later changes his or her mind." *Figueroa v. City of New York*, No. 05-cv-9594, 2011 WL 309061, at *3, 2011 U.S. Dist. LEXIS 9433, at *7 (S.D.N.Y. Feb. 1, 2011), *aff'd sub nom. Figueroa v. N.Y.C. Dep't of Sanitation*, 475 F. App'x 365 (2d Cir. 2012). "[T]he mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event." *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir. 1968); *see also Oparah v. N.Y.C. Dep't of Educ.*, No. 12-cv-8347, 2015 WL 4240733, at *5, 2015 U.S. Dist. LEXIS 90651, at *8 (S.D.N.Y. July 10, 2015) ("'Preliminary agreements' that address all negotiated terms are enforceable, even if they are oral, or written in an email, and even if they contemplate a subsequent memorialization in an executed document." (citations omitted)). "When a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that a choice simply because his assessment of the consequences was incorrect." *Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007); *see also MacDonald v. Dragone Classic Motor Cars*, No. 95-cv-499, 2003 WL 22056626, at *6, 2003 U.S. Dist. LEXIS 14587, at *20 (D. Conn. Apr. 29, 2003) (stating that "the parties are bound to the terms of the contract even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing").

5

There is no dispute that the parties here intended to be bound prior to the memorialization and execution of a written settlement agreement. At their court appearance on September 25, 2017, the parties' counsel announced that they had reached a settlement, and the main terms of the settlement—including as to the payment amount, nondisparagement, confidentiality, no admission of liability, and mutual release of all parties (including previously dismissed defendants)—were read in court. Plaintiff was present and did not object to any of the terms read into the record. When the Court stated that it would close the case by reason of settlement and would reopen it only if there was "some glitch in the payment or something like that" but not "to reassess the settlement," neither party objected. Notably, in his October 25, 2017 submission, Plaintiff affirms that he "has every intention to follow through with the Agreement outlined by this Court in a document dated September 25, 2017." (Dkt. No. 252, at 1). Given that the material terms of the settlement were read in court, as well as Plaintiff's concession that the settlement is binding on the parties, the Court concludes that the parties entered into an enforceable oral settlement agreement on September 25, 2017.

There is some disagreement, however, as to which terms form part of the agreement. On October 19, 2017, Plaintiff's attorney wrote the Court that Plaintiff would "not agree to the terms and conditions in the settlement agreement" drafted by Defendant's counsel.[5] (Dkt. No. 246). At the telephonic conference held on October 13, 2017, Plaintiff's attorney explained that Plaintiff objected to several terms—including the release of previously dismissed defendants, Defendant's nonadmission of liability, and the agreement's confidentiality and nondisparagement clauses— that had been read into the record on September 25, 2017. Plaintiff's counsel also indicated that

---

[5] Plaintiff disputes that he ever made that statement to his counsel. (Dkt. No. 256, at 1). Whether that statement was made is immaterial. Plaintiff's October 25, 2017 letter evidently shows that Plaintiff was objecting to the inclusion of terms agreed to in court, including the release of previously dismissed defendants and confidentiality. (*See* Dkt. No. 252).

Plaintiff would not agree to the agreement's severability clause—a standard clause whereby invalid contractual provisions are deemed severed so as not to affect the validity of the rest of the agreement. In his October 25, 2017 letter to the Court, Plaintiff again took exception with the draft's severability, confidentiality, and mutual release clauses, and Plaintiff added an objection to another standard provision concerning having been afforded the right to consult with counsel prior to execution of the agreement. (Dkt. No. 252, at 1). In the final iteration of his objections, dated October 26, 2017, Plaintiff appeared to abandon his prior objections except as to the severability and right-to-consult-counsel clauses, which were not mentioned in court. (*See* Dkt. No. 256).

Having reviewed the draft settlement agreement that Plaintiff attached to his October 27, 2017 letter (*see* Dkt. No. 252-2), the Court finds no basis for Plaintiff's characterization that it is "a prejudicial, one-sided agreement, favoring defendant." (Dkt. No. 252, at 1). The draft contains all the material terms read into the record on September 25, 2017. Further, given Defendant's offer to eliminate the severability and right-to-consult-counsel clauses, the Court concludes that any dispute concerning the memorialization of the settlement agreement is now moot.

### B.    Requests to Reopen the Case and Retain Jurisdiction to Enforce Settlement

Plaintiff seeks to reopen the case because the "settlement has not been consummated." (Dkt. No. 246). Plaintiff is correct that nonconsummation of the settlement is a basis for reopening the case. (Dkt. No. 240, ¶ 1). But the reason that the settlement has not been consummated is that Plaintiff objected to the inclusion of certain terms in the draft circulated by Defendant's counsel. Some of these terms were agreed to in court, as Plaintiff himself concedes. As for the other terms to which Plaintiff objected, they will be eliminated in a revised draft to be circulated by Defendant's counsel. In light of the binding settlement agreement between the parties and the absence of any dispute regarding the terms of that settlement, the Court finds no

basis for reopening the case. *See Powell*, 497 F.3d at 133 (affirming a district court's refusal to restore a case to the calendar despite nonconsummation of a settlement agreement where the district court concluded that the settlement was binding). Further, even assuming that the Court could retain jurisdiction to enforce the settlement agreement upon Plaintiff's unilateral request—an assumption that does not seem supported by the language of the dismissal order (*see* Dkt. No. 240, ¶ 3 (providing that "the *parties* . . . must submit a request that the Court retain jurisdiction" (emphasis added))) or Supreme Court precedent, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381-82 (1994) (explaining that a district court may retain jurisdiction to enforce a settlement agreement after dismissal under Fed. R. Civ. 41(a)(1)(ii) only "if the parties agree" to "embody the settlement contract in [the] dismissal order," and after dismissal under Fed. R. Civ. 42(a)(2) only if the court so provides, "in [its] discretion," in the dismissal order)—the Court would not exercise its discretion to do so in the present circumstances. Accordingly, Plaintiff's requests to reopen the case and for the Court to retain ancillary jurisdiction over enforcement of the settlement agreement are denied.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's requests (Dkt. Nos. 246, 252) that the Court reopen the case and retain ancillary jurisdiction over enforcement of the settlement agreement are **DENIED**; and it is further

**ORDERED** that Defendant's letter motion (Dkt. Nos. 250, 260) is **GRANTED** in part and **DENIED** in part, in that Defendant's request for dismissal with prejudice is **GRANTED**, and Defendant's request for sanctions is **DENIED**; and it is further

**ORDERED** that this action is **DISMISSED with prejudice** in its entirety in accordance with the Court's September 25, 2017 dismissal order.

**IT IS SO ORDERED.**

Dated: November 1, 2017
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

2011 WL 309061
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Marilyn FIGUEROA, Plaintiff,
v.
CITY OF NEW YORK and New York City
Department of Sanitation, Defendants.

No. 05 Civ. 9594(JGK).
|
Feb. 1, 2011.

*MEMORANDUM OPINION AND ORDER*

JOHN G. KOELTL, District Judge.

**\*1** The defendants move to enforce a settlement reached by the parties during settlement negotiations with the plaintiff's former attorney, Linda Cronin. The plaintiff, who now appears pro se, objects to enforcement of the agreement on the grounds that (1) she was allegedly induced to enter into it under conditions constituting economic duress; (2) she did not validly confer authority on Ms. Cronin to settle the lawsuit, because Ms. Cronin concealed key terms of the settlement agreement from her; and (3) the agreement was not committed to writing or stipulated to in open court.

**I.**

The plaintiff, Marilyn Figueroa, brings this action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, et seq. ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), and the New York City Human Rights Law, New York City Administrative Code § 8–101, et seq. (the "NYCHRL"), alleging that the defendants discriminated against her on the basis of her gender and disabilities (high-risk pregnancy, anemia, and hemorrhaging). The plaintiff alleges that the defendants failed to accommodate her disabilities, and that they harassed and retaliated against her.

At a hearing on January 30, 2009, the Court dismissed with prejudice the plaintiff's gender discrimination claims under Title VII and the NYCHRL. Hr'g Tr. 19:8–9, 24:21–23, Jan. 30, 2009. It also dismissed with prejudice the plaintiff's claim pursuant to the ADA, on the ground that she had failed to allege the existence of a disability covered by the ADA. Tr. 29:9–12. The Court held that questions of fact remained as to whether the plaintiff's medical conditions were disabilities under the NYCHRL and whether she had received a reasonable accommodation. Tr. 30:24–31:3, 31:22–24. The Court also denied the defendants' motion for summary judgment on the Title VII and NYCHRL retaliation claims. Tr. 27:21–23. Finally, the Court held that the plaintiff's allegations concerning events occurring after the filing of her second amended complaint, in November 2007, were not at issue in this case. Tr. 21:23–22:1.

By order dated January 30, 2009, the Court referred this case to Magistrate Judge Freeman for purposes of settlement. *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. Jan. 30, 2009) (order of reference to a magistrate judge). In April 2009, counsel for the parties informed the Court that a settlement had been reached. On April 27, 2009, however, the plaintiff sent a letter to the Court, indicating that she believed the settlement was unreasonable and unfair. *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. April 27, 2009) (order forwarding the plaintiff's letter to counsel for the parties). The defendants did not seek to enforce the alleged settlement agreement. By order dated May 29, 2009, the Court granted the motion to withdraw by David Fish, the plaintiff's attorney at that time. *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. May 29, 2009) (order granting motion to withdraw).

**\*2** On June 26, 2009, Linda Cronin, the plaintiff's attorney during the events relevant to this motion, filed a notice of appearance. Notice of Appearance, *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. June 26, 2009), ECF No. 54. By order dated December 3, 2009, the Court again referred this matter to Magistrate Judge Freeman for purposes of settlement. *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. Dec. 3, 2009) (order of reference to a magistrate judge). Magistrate Judge Freeman conducted several settlement conferences, at which the plaintiff was represented by Ms. Cronin.

By letter dated July 2, 2010, the defendants requested leave to withdraw without prejudice their pending motion in limine, and the parties jointly requested until July 23, 2010, to conclude their settlement discussions. The Court granted the application on July 6, 2010. Declaration of

Eamonn Foley in Support of Defendants' Motion to Enforce Settlement Agreement ("Foley Decl.") Exh. B, *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. August 20, 2010).

According to the defendants, between July 2 and July 23, 2010, the parties negotiated and ultimately arrived at a settlement. Foley Decl. ¶ 22. On July 22 and 23, 2010, counsel for the parties discussed and confirmed in writing the basic terms of the settlement agreement, including (1) the money to be paid by the defendants to the plaintiff, (2) the manner and timing of the plaintiff's departure from employment by the defendants, (3) a release of claims in favor of the City and a withdrawal of the plaintiff's pending claims, complaints, and challenges, (4) that the plaintiff would execute the usual settlement paperwork, including a general release and affidavit of no liens, and (5) that the plaintiff would remain on sick leave pending the determination of her pending disability retirement application. Foley Decl. ¶¶ 23–24 & Exhs. C, D. The plaintiff gave her consent to Ms. Cronin to accept the settlement on her behalf. Unofficial transcript of telephone call between the plaintiff and Ms. Cronin ("Tr.") at 14, attached as Exhibit A to Opposition to Motion to Enforce Settlement, *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. November 29, 2010).

The defendants' counsel, with Ms. Cronin's consent, advised the Court that the parties had settled the case and were preparing settlement papers setting out the terms of the agreement. Foley Decl. ¶ 25 & Exh. E. The parties requested a hearing at which the plaintiff would confirm her understanding of an agreement to the terms of the settlement.

Between July 28 and July 30, 2010, counsel for the parties spoke by telephone several times and exchanged four drafts of the settlement documents. Foley Decl. ¶¶ 27–31 & Exhs. F–I. The settlement papers were finalized. Foley Decl. ¶ 32 & Exh. J.

On July 30, 2010, the defendants' counsel wrote, with Ms. Cronin's consent, to inform the Court that the plaintiff had changed her mind, and did not wish to enter into the settlement agreement. Foley Decl. ¶ 33; Letter from Eamonn Foley, *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. July 30, 2010), ECF No. 78. At a conference on August 3, 2010, Ms. Cronin confirmed that the parties had agreed to settle the action on July 23, 2010, and that the terms of the agreement to which the plaintiff had agreed were reflected in the settlement papers submitted to the Court. Foley Decl. ¶ 34 & Exh. K at 3–4. During a telephone conference on August 6, 2010, Ms. Cronin again stated that the plaintiff had agreed to the

settlement agreement, and that the plaintiff had agreed to the terms reflected in the settlement documents. Foley Decl. ¶ 37 & Exh. L at 4–5.

**\*3** On August 24, 2010, Ms. Cronin filed a motion to withdraw as the plaintiff's attorney, on the ground that she believed the plaintiff had entered into a binding settlement agreement, and that Ms. Cronin could not in good conscience argue otherwise, as the plaintiff asked her to do. Memorandum of Law in Support of Motion for Linda M. Cronin (Cronin & Byczek) to Withdraw as Attorney of Record, *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. August 24, 2010). By order dated October 20, 2010, the Court granted Ms. Cronin's motion to withdraw. *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. Oct. 20, 2010) (order granting motion to withdraw).

## II.

Parties can enter into binding oral agreements. *Winston v. Mediafare,* 777 F.2d 78, 80 (2d Cir.1985). Where the parties intend to be bound, an oral settlement of a litigation is binding even if a party later changes his or her mind. *See Powell v. Omnicom,* 497 F.3d 124, 129–30 (2d Cir.2007).

To determine whether the parties intended to be bound in the absence of a document executed by both sides, the Court should consider "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Winston,* 777 F.2d at 80.

In this case, there is no dispute that the parties intended to be bound prior to executing a written agreement. The plaintiff does not dispute that she authorized Ms. Cronin to settle the suit on her behalf. Nor does she dispute the defendants' contention that Ms. Cronin and the defendants thereafter entered into an oral settlement agreement. Instead, she argues that the settlement agreement is not binding because (1) she was induced to enter into it under conditions constituting economic duress; (2) she did not validly confer authority on Ms. Cronin to settle the suit, because Ms. Cronin concealed key terms of the settlement agreement from her; and (3) the agreement did not comply with a New York state procedural rule requiring settlement agreements to be committed to writing or made in open court. None of

these arguments has merit.

**A.**

In order to avoid the enforcement of an agreement on the basis of "economic duress," a party must demonstrate that a wrongful threat precluded the exercise of her free will and caused her involuntarily to accept the terms of the agreement. Specifically, the party "must show: (1) a threat, (2) unlawfully made, (3) which caused involuntary acceptance of contractual terms, (4) because the circumstances permitted no alternative." *Raghavendra v. Trs. Of Columbia Uni.,* 686 F.Supp.2d 332, 342 (S.D.N.Y.2009) (internal quotation marks omitted) (collecting cases); *see also Kamerman v. Steinberg,* 891 F.2d 424, 431 (2d Cir.1989); *Mathias v. Jacobs,* 167 F.Supp.2d 606, 614 (S.D.N.Y.2001). Notably, "dissatisfaction or disagreement with counsel during settlement negotiations does not constitute duress." *Id.* at 344 (rejecting claim of duress where plaintiff was "brow-beaten" and "shouted down" during negotiations).

**\*4** It is plain that the plaintiff's allegations of mistreatment by Ms. Cronin do not rise to the level of duress. The plaintiff alleges only that Ms. Cronin was "hostil[e]," "impatien[t]," and "condescend[ing]." Opposition to Motion to Enforce Settlement at 2, *Figueroa v. City of New York,* No. 05 Civ. 9594 (S.D.N.Y. November 29, 2010) ("Br."). These circumstances do not constitute the type of "unlawful threat" necessary to support a claim of duress, and are not a basis for refusing to enforce the settlement agreement.

The plaintiff has submitted a transcript of two telephone calls with Ms. Cronin that the plaintiff apparently surreptitiously recorded. The transcripts do not reflect duress, but rather an effort by Ms. Cronin to obtain a clear and unequivocal decision from the plaintiff that the plaintiff was in fact agreeing to the settlement. The plaintiff did in fact agree without duress. *See* Tr. at 14.

**B.**

The plaintiff's second argument, that the settlement agreement should not be enforced because she did not validly confer authority on Ms. Cronin to settle the suit, is also unavailing. The plaintiff alleges that Ms. Cronin procured her consent to the settlement by concealing key terms of the settlement from her. Br. at 4.

This argument fails because, notwithstanding the plaintiff's alleged ignorance of certain terms of the agreement, she explicitly authorized Ms. Cronin to enter into the settlement agreement. The relationship between a lawyer and client is one of agent and principal. *United States v. International Bhd. of Teamsters,* 986 F.2d 15, 20 (2d Cir.1993). The decision to settle a case rests with the client, and a client does not automatically bestow the authority to settle a case on retained counsel. *Fennell v. TLB Kent Co.,* 865 F.2d 498, 501–02 (2d Cir.1989). Nonetheless, an attorney's actual authority "may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *International Bhd.,* 986 F.2d at 20. Here, the plaintiff explicitly agreed to settle the case without seeing a written copy of the settlement agreement. *See* Tr. at 14. Ms. Cronin did review the critical terms with the plaintiff, including the amount of money the plaintiff would receive, Tr. at 2, Ms. Cronin's fees, Tr. at 2, future litigation over the plaintiff's pension, Tr. at 3, the plaintiff's disability benefits, Tr. at 7–8, and the legal effect of the settlement agreement, Tr. at 10. The plaintiff then explicitly gave her attorney the authority to agree to the settlement. Tr. at 14.

Moreover, it is clear that the agreement is also enforceable because Ms. Cronin had apparent authority to enter into the agreement. "The doctrine of apparent authority comes into play when a party ... reasonably believes that another party ... has delegated authority to enter into an agreement on its behalf to an agent." *Trustees of UIU Health & Welfare Fund v. New York Flame Proofing Co.,* 828 F.2d 79, 83–84 (2d Cir.1987).

**\*5** In this case, the parties were referred to the magistrate judge for settlement purposes. Pursuant to that reference, the magistrate judge conducted a number of settlement conferences, at which the plaintiff authorized Ms. Cronin to appear on her behalf. Ultimately, Ms. Cronin agreed to the settlement after she informed the plaintiff that Ms. Cronin needed to respond to the defendants' attorney. *See* Tr. at 8, 14; *see also* Foley Decl. Exh. K at 5–6. Accordingly, Ms. Cronin also had apparent authority to settle the suit on the plaintiff's behalf.

**C.**

Finally, the plaintiff contends that the settlement agreement is not enforceable because it was not committed to writing or made in open court. For this proposition, the plaintiff relies on the New York state

court rule that a settlement agreement is generally valid "only if both parties stipulate to the settlement in a written agreement or it is made in open court and placed on the record." *Diarassouba v. Urban,* 892 N.Y.S.2d 410, 413 (App.Div.2009); *see also* N.Y. C.P.L.R. § 2104.

The requirement that a settlement agreement either be reduced to writing or stipulated to in open court does not apply to this case, however. Where an action is based on federal law (here, Title VII), an attorney's authority to settle the action is a federal question, and hence federal law applies. *Foster v. City of New York,* 96 Civ. 9271, 2000 WL 145927, at *3 (S.D.N.Y. Feb. 7, 2000) (citing *Fennell v. TLB Kent. Co.,* 865 F.2d 498, 501 (2d Cir.1989); *In re Artha Mgmt. Inc.,* 91 F.3d 326, 329 (2d Cir.1996)). "Under common law principles adopted by the federal courts, parties are free to enter into settlement without memorializing their agreement in a fully executed document, and such agreements are as enforceable as any other oral contract." *Id.* (citing *Winston,* 777 F.2d at 80–83). As a result, the United States district courts within the state of New York have repeatedly enforced oral settlement agreements such as this one. *See, e.g., Kaczmarczyk v. Acme Contr. LLC,* No. 06 Civ. 1005, 2009 WL 3739442, at *8 (E.D.N.Y. Nov. 3, 2009); *Delyanis v. Dyna–Empire, Inc.,* 465 F.Supp.2d 170, 176 (E.D.N.Y.2006); *Conway v. Brooklyn Union Gas Co.,* 236 F.Supp.2d 241, 253 (E.D.N.Y.2002); *Kilcullen v. Metro North Commuter R.R. Co.,* No. 95 Civ. 6331, 1998 WL 647171, at *7 (S.D.N.Y. Sept. 22, 1998); *Hartford Fire*

*Ins. Co. v. SS "An Chun",* No. 96 Civ. 7738, 1997 WL 790578, at *2 (S.D.N.Y. Dec. 23, 1997). The plaintiff does not dispute the defendants' contention that the parties entered into an oral settlement agreement; she merely argues that this settlement agreement was unenforceable because it did not comply with the formalities of New York state law. Under the federal rule, however, an oral agreement to settle may be enforced to the same extent as a written one.

## CONCLUSION

For the reasons discussed above, the defendants' motion to enforce the settlement agreement is **granted.** The defendant should submit a proposed judgment consistent with this opinion by **February 7, 2011.** The plaintiff can submit any counter-judgment by **February 14, 2011.** The Clerk is directed to close **Docket No. 83.**

**\*6 SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2011 WL 309061

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2003 WL 22056626
Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.

John L. MACDONALD
v.
DRAGONE CLASSIC MOTOR CARS Emanuel
Dragone and George Dragone

No. 395CV499 (JBA).
|
Filed March 20, 1995.
|
April 29, 2003.

**Attorneys and Law Firms**

Eric D. Grayson, Greenwich, Ct, for John L. MacDonald, plaintiff.

David Paul Friedman, Zeldes, Needle & Cooper, Bridgeport, CT, S. Dave Vatti, Shelton, CT, for Emanuel Dragone, defendant.

David Paul Friedman, S. Dave Vatti, (see above), for George Dragone, defendant.

David Paul Friedman, S. Dave Vatti, (See above), for Dragone Classic Motor Cars, defendant.

David Paul Friedman, Zeldes, Needle & Cooper, Bridgeport, CT, S. Dave Vatti, Shelton, CT, for Emanuel Dragone, counter-claimant.

David Paul Friedman, S. Dave Vatti, (See above), for George Dragone, counter-claimant.

David Paul Friedman, S. Dave Vatti, (See above), for Dragone Classic Motor Cars, counter-claimant.

Eric D. Grayson, Greenwich, CT, for John L. MacDonald, counter-defendant.

*RECOMMENDED RULING ON DEFENDANTS
MOTION TO REOPEN CASE AND ENFORCE
SETTLEMENT*

MARGOLIS, Magistrate J.

**\*1** On March 20, 1995, plaintiff initiated this diversity action against Dragone Classic Motor Cars, Emanuel Dragone and George Dragone ["defendants"] arising out of the sale and restoration of certain classic cars (Dkt.# 1); a nine-count amended complaint was filed on June 6, 1996. (Dkt.# 44). On January 17, 1996, the parties consented to trial before United States Magistrate Judge Donna F. Martinez. (Dkt.# 15). Jury selection was held on June 18, 1996, with trial to commence one week later. (Dkt.# 65). The case settled at the final pre-trial conference, held on June 21, 1996. (Dkt.# 74).

Four weeks later, on July 19, 1996, defendants filed their first Motion to Enforce Settlement and affidavits in support. (Dkts.76–78). In turn, on August 2, 1996, plaintiff filed a Motion for Temporary Restraining Order ["TRO"] and brief in support (Dkts.80–81), which Magistrate Judge Martinez granted that day. (Dkt.# 86). Continued settlement conferences were held on August 6–7, 1996 (Dkts.79, 83–84) and on August 7, 1996, the parties agreed to a settlement on the record in open court (Dkt.# 85).[1] Defendants' Motion to Enforce was therefore denied as moot by Magistrate Judge Martinez that same day. On August 23, 1996, the parties filed their Stipulation of Dismissal (Dkt. # 87), which was endorsed by United States District Judge Janet Bond Arterton on October 4, 1996, thus closing the case.

---

[1]    The transcript erroneously indicates that the hearing was held before then Chief Judge Peter C. Dorsey, instead of Magistrate Judge Martinez.

---

On October 29, 1996, defendants filed their second Motion to Reopen the Dismissal. (Dkt.# 89). Sixteen days later, on November 14, 1996, plaintiff filed a Cross–Motion to Dismiss and brief in support (Dkts.90–91); supplemental briefs were filed on November 21, 1996 and December 3, 1996. (Dkts.92–93). On May 20, 1997, defendants filed a Motion to Withdraw the Motion to Reopen (Dkt.# 94), which Magistrate Judge Martinez granted seven days later, with prejudice and denied plaintiff's Cross–Motion as moot. (Dkt.# 95).

Some five years later, on February 13 2003, defendants filed their third Motion to Reopen the Case and Enforce Settlement, and brief in support (Dkts. 96–97),[2] now pending before this Court, as to which plaintiff filed his brief in opposition on March 6, 2003. (Dkt.# 98).[3] On March 12, 2003, Judge Arterton referred the pending motion to this Magistrate Judge. (Dkt. # 99). Defendants filed their reply five days later. (Dkt.# 100).

2    Attached to defendants' motion (Dkt.# 96) are the following four exhibits: (1) copy of the Transcript of Settlement Hearing Before Magistrate Judge Martinez on August 7, 1996 (Exh. A; *see also* Dkt. # 85); (2) copy of the Release, signed by plaintiff, dated August 8, 1996 (Exh. B); (3) copy of Stipulation of Dismissal, filed August 23, 1996 and endorsed by Judge Arterton on October 4, 1996 (Exh. C; *see also* Dkt. # 87); (4) copy of revised complaint in *MacDonald v. Dragone,* CV 97–0160703, filed in the Superior Court for Stamford/Norwalk at Stamford, dated November 21, 1997 (Exh. D); and (5) copy of the Consent Order for Relief from the Automatic Stay, in *In re Dragone,* Case No. 00–51313, filed in United States Bankruptcy Court on May 9, 2001 (Exh. E).
     Attached to defendants' brief in support (Dkt.# 97) are copies of case law.

3    Attached is another copy of Stipulation of Dismissal, filed August 23, 1996 and endorsed by Judge Arterton on October 4, 1996.

For the reasons set forth below, defendants' Motion to Reopen the Case and Enforce Settlement (Dkt.# 96) is *granted to the extent set forth below.*

### I. FACTUAL BACKGROUND

As previously indicated, at the pretrial conference before Magistrate Judge Martinez on June 21, 1996, the parties entered into a settlement agreement whereby plaintiff was to and did receive from defendants a check for $7.500, notarized general releases from defendants, a 1952 Porsche, a 1959 Jaguar and a 1966 Ford Mustang/Shelby, and bills of sale and indemnity, signed by defendants for the Porsche, Jaguar and Ford Mustang, which specified the vehicles were transferred as is, without warranty or representation, except as to title. (Dkt. # 76, at 2–3 & Exh. A; Dkt. # 81, Exh. A; Dkt. # 96, at 1–2; Dkt. # 98, at 6). In exchange, plaintiff was to file a Stipulation of Dismissal with prejudice upon delivery of the automobiles, provide defendants with a notarized release provide defendants with indemnity with respect to a 1946 Delahaye and submit an affidavit and deed transferring the Delahaye to defendants because at the time, the title was missing or lost. (Dkt. # 76, at 2–3 & Exh. A; Dkt. # 89, at 1–2; Dkt. # 96, at 1–2; Dkt. # 98, at 6).

**\*2** Approximately one month later, on July 19, 1996, defendants filed their first Motion to Reopen and Enforce the Settlement because plaintiff did not file the Stipulation of Dismissal and did not deliver to defendants the promised documents. (Dkt. # 76, at 5–6). In his brief in support of his Motion for TRO, plaintiff argued that he was justified in failing to complete his duties under the settlement agreement because defendants procured the title to the Delahaye by fraud by trading what was represented as a Shelby Mustang, worth $38,000, when in fact the car was an ordinary Ford Mustang, made to look like a real Shelby. (Dkt. # 81; *see* Dkt. # 98, at 6). According to defendants, plaintiff demanded that defendants immediately find and tender to plaintiff an original Grade A Shelby or replace it with $38,000. (Dkt. # 76, at 4–6). Defendants rejected plaintiff's demand, reminding plaintiff's counsel that plaintiff's classic car expert inspected the cars prior to delivery and the Bill of Sale, as part of the settlement, "specified in no uncertain terms that the three cars were being transferred *as is, without warranty or representation."* thus, plaintiff is precluded from asserting any new claims against defendant. (Dkt. # 76, at 5)(emphasis in original).

As a result of this first unresolved conflict between the parties, plaintiff filed a Motion for TRO, to prevent the sale, transfer, or encumbrance of the Delahaye (Dkts.# 80–81), which motion was granted pending the settlement conference on August 7, 1996. (Dkt.# 86). A two-day settlement conference was held before Magistrate Judge Martinez on August 6–7, 1996 and at the conclusion of the second day, the parties, on the record and in open court, agreed that in addition to plaintiff retaining possession of the three cars and the $7,500 received pursuant to the earlier agreement, plaintiff would receive an additional $7,500 in exchange for plaintiff's waiver and release of any and all underlying claims or claims relating to the settlement ["Release"]. (Dkt.# 85). In open court, plaintiff's counsel represented:

> We are ... waiving, settling and releasing ... any claims arising out of the settlement agreement or purported breach of the settlement agreement, any claims arising out of the inspection or possession of those cars, any claims that were raised in the litigation to enforce the settlement agreement, and any of our claims to rescind that settlement agreement.
>
> We ... waive and settle, release all our Rule 60 options, which would be to unwind this settlement agreement for fraud, neglect, mistake, and anything else raised in Rule 60.

(Dkt. # 85, at 3–4). Shortly thereafter, defense counsel clarified:

> What has to be absolutely clear is that the plaintiff is releasing and waiving any claim which was asserted in

this litigation, or could have been asserted in this litigation, and any claim which occurred up to the present time and based on facts alleged up to the present time, and that includes any claim which could be filed in any other forum, any other court, any other jurisdiction or institution of any kind, based on anything that occurred up until the present time.

**\*3** I want to make it absolutely clear that ... we don't want to see ... an action brought with the attorney general or some other agency based on the very same claims and allegations ... which either were asserted in this action or in connection with the discussions concerning the enforcement of the settlement agreement, or could have been asserted in connection with that motion, absolutely clear that everything is being waived that has occurred up to the present time, including any claims of mistake, inadvertence, excusable neglect, newly discovered evidence, or fraud.

(*Id.* at 5). Plaintiff's counsel responded, "I think I made that pretty clear when I said ...'All options available under Rule 60.' ' (*Id.*). When Magistrate Judge Martinez inquired, "[s]o you are in agreement with [defense counsel's] statement as to the understanding between the parties," plaintiff's counsel replied, "I think that's correct." (*Id.* at 5–6).

Defendants made the additional $7.500 payment and plaintiff executed and delivered the Release which included release

> from all claims which have or could have been asserted concerning the sufficiency, adequacy or authenticity of the consideration tendered to [plaintiff] as part of the settlement of [this case] as well as any claims that the settlement was procured by mistake, inadvertence, excusable neglect, newly discovered evidence, fraud, or any other reason which otherwise could constitute a basis for [plaintiff] to seek additional relief from [defendants] relating in any manner to [defendants].

(Dkt.# 96, Exh. B). Thereafter, on August 23, 1996, the parties filed a Stipulation of Dismissal with prejudice (Dkt.# 87), which was endorsed by the Judge Arterton on October 4, 1996. The Stipulation of Dismissal provides:

> Pursuant to Rule 41(a) of the Federal Rules of Civil Procedure, plaintiff John L. Macdonald and defendants Dragone Classic Motor Cars, Emanuel Dragone and George Dragone hereby dismiss with prejudice and without costs, by stipulation, the First Amended Complaint filed by plaintiff and the Counterclaims filed by defendants in this action.

(Dkt.# 87). Before the stipulation was endorsed, however, on September 18, 1996, Magistrate Judge Martinez held a telephone conference upon request of defendants because plaintiff had found the title to the Delahaye but was refusing to deliver it to defendants because the title was encumbered as a result of a loan transaction in which plaintiff had been involved. (Dkt. # 88; Dkt. # 89, at 2–3).[4] This refusal triggered defendants' second Motion to Reopen, filed October 29, 1996 (Dkt.# 89) and plaintiff's Cross–Motion to Dismiss defendants' Motion to Reopen, filed November 14, 1996 (Dkt.90–91). Plaintiff's counsel tendered the original Delahaye title to defendants' counsel on May 20, 1997, thus mooting these two motions. (*See* Dkts.94–95).

[4]    According to defendants, during this conference, plaintiff's counsel advised the Court and defense counsel that plaintiff would tender the title within 45 days; Magistrate Judge Martinez informed plaintiff that such title had to be delivered immediately. (Dkt. # 89, at 2–3).

In 1997, plaintiff, after learning that the Porsche was "not original," commenced an action in state court against defendants for fraud in connection with the August 7, 1996 settlement and Release and for a rescission of the Release. (Dkt. # 96, Exh. D; Dkt. # 98, at 8). Plaintiff claims that "[i]n order to induce [him] to sign the Release and withdraw the District Court Action, [defendants] represented to [plaintiff] and Judge Martinez that the Porsche was 'all original', in 'excellent condition' and that there was no fiberglass in the bumpers.' Based on these representations upon which [plaintiff] relied, [plaintiff] signed the Release." (Dkt. # 98, at 7). *After* plaintiff signed the Release, plaintiff's qualified expert inspected the Porsche and found that the Porsche was not all original, causing plaintiff to suffer damages of $45,000. (*Id.* at 7–8). Plaintiff thereafter filed his complaint in state court. (*Id.* at 8). The parties met on two occasions with a Superior Court Judge for purposes of

2003 WL 22056626

pretrial settlement before the case was placed on active jury calendar and set for trial. (*Id.*).

**\*4** On October 5, 2000, defendants filed an involuntary petition for relief in United States Bankruptcy Court, which was later converted to a voluntary case under Chapter 11 of the Bankruptcy Code, thus staying plaintiff's state court action. (Dkt. # 96, at 5; Dkt. # 98, at 8). According to defendants, plaintiff has asserted a claim as an unsecured creditor in each of defendants' Chapter 11 cases and had himself appointed as a member of the Creditors' Committee in each of the cases. (Dkt. # 96, at 5). On March 14 and 21, 2001, defendants filed in the Bankruptcy Court an Objection to Claim of John L. MacDonald and Motion to Remove John L. MacDonald as a Member of the Creditor's Committee. (*Id.* at 6). On May 9, 2001, then Chief United States Bankruptcy Judge Alan H.W. Shiff entered a Consent Order for Relief from the Automatic Stay, allowing defendants and plaintiff "to take whatever actions they deem appropriate in the District Court Action, including moving to reopen that action, to determine the validity of [plaintiff's] claims against [defendants]." (Dkt.# 96, Exh. E).

Defendants now assert, in their third Motion to Reopen and Enforce the Settlement, that the terms of the August 7, 1996 settlement serve as an absolute bar to the claims that plaintiff has asserted against defendants in the state court complaint and in defendants' bankruptcy cases. (Dkt. # 96, at 6). Plaintiff contends that defendants are seeking to obtain relief from this Court that is not obtainable in Bankruptcy Court, where this case belongs. by filing this motion in a "blatant attempt to disrupt the presentation of the Creditors' Committee's plan for liquidation." (Dkt. # 98, at 4).

## II. DISCUSSION

### A. JURISDICTION

The enforcement of a settlement agreement is "more than just a continuation or renewal of the dismissed suit, and hence requires its own basis for jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 378 (1994); *see also Scelsa v. CUNY,* 76 F.3d 37 (2d Cir.1996). Thus, "[i]n absence of such an independent basis for jurisdiction, a federal court has jurisdiction to enforce a settlement agreement only if the dismissal order specifically reserves such authority or the order incorporates the terms of the agreement." *Scelsa,* 76 F.3d at 40 (citing *Kokkonen,* 511 U.S. at 381). Plaintiff correctly asserts, and defendants do not dispute, that in

this case, as in *Kokkonen* and *Scelsa,* the district court did not expressly retain jurisdiction over the settlement agreement, nor did the dismissal order incorporate the terms of the settlement.[5] However, defendants assert that an independent basis for jurisdiction exists as all three defendants have Chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of Connecticut in Bridgeport, and the Bankruptcy Court in each of those cases has entered an order granting the parties relief from the automatic stay for purposes of having this Court determine the validity of plaintiff's claims against defendants (Dkt. # 97, at 2–3; *see* Dkt. # 96, Exh. E).

[5]    Plaintiff relies on this position to the exclusion of all others; specifically, plaintiff does not address the possibility that an independent basis for jurisdiction exists. (*See* Dkt. # 98). The only reference plaintiff makes to the bankruptcy proceeding is not to acknowledge a basis for jurisdiction, but rather, to claim that the "only reason [defendants] are filing this motion is to attempt to obtain relief in this Court that is not obtainable in the Bankruptcy Court, which is where this case belongs ." (Dkt. 98, at 4).

**\*5** District courts have "original and exclusive jurisdiction over all cases under [T]itle 11," and "[n]otwithstanding any Act of Congress that confers exclusive jurisdiction on a court ... other than the district courts. the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under [T]itle 11, or arising in or related to cases under [T]itle 11 ." 28 U.S.C. §§ 1334(a) & (b). The legislative history of 28 U.S.C. § 1334 indicates that "arising under" jurisdiction and "arising in" and "related to" cases under Title 11 should be broadly construed to include any matter under which a claim is made pursuant to Title 11. Bankruptcy Reform Act of 1978, S. REP. No. 989, 95th Cong. Moreover, the term "proceeding" includes issues which may arise after a case is closed, such as the breach of a settlement agreement that resulted in the dismissal and closure of a case. *Id* . Moreover, 28 U.S.C. § 1334(b) evidences the intent of Congress to bring all bankruptcy-related litigation within the purview of the district court; thus, this District Court, upon consent from the parties and Judge Shiff, has jurisdiction over defendants' pending motion. *See* 1–3 COLLIER ON BANKRUPTCY ¶ 3.01 (15th ed.2003). Because jurisdiction exists relating to the bankruptcy action, an independent basis for jurisdiction exists for this Court to reopen this case and enforce the settlement agreement.

Defendants also rely on 28 U.S.C. § 157(d) as an additional basis for jurisdiction. This District Court

referred this case to the bankruptcy court on September 21, 1984, pursuant to 28 U.S.C. § 157(a). 28 U.S.C. § 157(a) provides: "Each district court may provide that any or all cases under [T]itle 11 and any or all proceedings arising under [T]itle 11 or arising in or related to a case under [T]itle 11 shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(d) provides that "[t]he district court may withdraw, in whole or in part. any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." Defendants submit, and the Court agrees, that this Court now has jurisdiction over plaintiff's pending claims by virtue of the Consent Order signed by the parties and Judge Shiff, which allowed defendants and plaintiff "to take whatever actions they deem appropriate in the District Court Action, including moving to reopen that action, to determine the validity of [plaintiff's] claims against [defendants]." (Dkt.# 96, Exh. E).[6]

[6] Defendants now seek to withdraw, pursuant to 28 U.S.C. § 157(d), the original reference, which established jurisdiction in the bankruptcy court. *See In re Dragone,* 3:03 MC 73(SRU) (Defendants' Motion to Withdraw Reference, Dkt. # 1). Plaintiff asserts that defendants have moved to withdraw the reference "so they can attempt to remove [plaintiff] from the Creditors Committee" and defendants' motions are "not based on any meritorious arguments, but [are] a blatant attempt to disrupt the presentation of the Creditors' Committee's plan for liquidation." (Dkt. # 98, at 4). The motion to withdraw the reference, however, is not before this Magistrate Judge.

> Plaintiff also suggests that "[i]f there were any credence to [defendants'] motions, they would have been brought in 2000, not at the 23rd hour." (*Id.* at 4). Defendants, however, assert that two years ago, on March 21, 2001, they filed an objection to plaintiff's claims and a motion to remove him from the Creditors' Committee with the Bankruptcy Court. (Dkt. # 100, at 4; Dkt. # 96, at 6). Moreover, as defendants properly point out, the Consent Order filed on May 9, 2001 authorizes defendants to take their actions to this Court, without placing a deadline. (Dkt. # 100; Dkt. # 96, at 6 & Exh. E).

Plaintiff also asserts that the courts in this Circuit repeatedly have held that "allegations of breach of a settlement agreement did *not* constitute 'extraordinary circumstances' under Rule 60(b) because the complaining party 'may obtain virtually the same relief by filing a new action in state (court)' therefore there is no showing that an 'extreme and unexpected hardship would occur.' ' (Dkt. # 98, at 4)(citing, *inter alia, Stonewall Ins. Co. v. National Gypsum Co.,* 1992 WL 51567, at *5 (S.D.N.Y. Mar. 9, 1992)). Rule 60(b) provides, in pertinent part, that

the court may relieve a party from a final judgment or order for among other reasons, mistake inadvertence, surprise, fraud, misrepresentation, or "other misconduct of an adverse party." However, such motion seeking this relief "shall be made within a reasonable time," and for the reasons applicable to this case. e.g. fraud, misrepresentation etc. "not more than one year after the judgment, order, or proceeding was entered or taken." FED. R. CIV. P. 60(b). The dismissal sought to be reopened was endorsed on October 4, 1996. Thus, without even addressing whether "extraordinary circumstances" would exist in this case, Rule 60(b) is inapplicable because the pending motion was not filed until March 2003. *See Stonewall Ins.,* 1992 WL 51567, at *6.

## B. ENFORCEMENT OF THE SETTLEMENT AGREEMENT

### 1. VALIDITY OF THE SETTLEMENT AGREEMENT

**\*6** In order to reach a valid settlement agreement, the parties must voluntarily enter into the agreement and the parties must mutually assent to the terms and conditions of the agreement. *Millgard Corp. v. White Oak Corp.,* 224 F.Supp.2d 425, 432 (D.Conn.2002) (citation omitted); *Brown v. Nationscredit Commercial,* 2000 WL 888507, at *2 (D. Conn. June 23, 2000) (citations omitted); *see also v. Johnson v. Schmitz,* 237 F.Supp.2d 183, 189 (D.Conn.2002)(multiple citations omitted). However, once reached, a settlement agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if a party has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing. *Pultney Arms, LLC v. Shaw Industries, Inc.,* 2002 WL 31094971, at *2 (D.Conn. Sept. 6, 2002); *Johnson,* 237 F.Supp.2d at 189; *Brown,* 2000 WL 888507. at *2. Moreover, "[a] district court has the power to enforce summarily, on motion, a settlement agreement reached in a case pending before it." *Meetings & Expositions, Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir.1974)(multiple citations omitted); *see also Pultney Arms,* 2002 WL 31094971, at *2; *Brown,* 2000 WL 888507. at *2; *Audubon Parking Assocs. Ltd. P'ship v. Barclay & Stubbs, Inc.,* 225 Conn 804, 811, 626 A.2d 729, 733 (1993). "Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes." *Audubon,* 225 Conn. at 812. As Judge Newman, writing for the majority of the Second Circuit, noted:

> Due regard for the proper use of judicial resources requires that a

trial judge proceed with entry of a settlement judgment after affording the parties an opportunity to be heard as to the precise content and wording of the judgment, rather than resume the trial and precipitate and additional lawsuit for breach of a settlement agreement. This authority should normally be exercised whenever settlements are announced in the midst of trial.

*Janus Films, Inc. v. Miller,* 801 F.2d 578, 583 (2d Cir.1986).

Summary enforcement is appropriate here, where the language used in court and on the record, and in the signed Release, is clear and unambiguous. At the conclusion of a twoday follow-up settlement conference before Magistrate Judge Martinez, the parties agreed on the record and in open court that in addition to plaintiff retaining possession of the three cars and the $7,500 received pursuant to the earlier agreement, plaintiff would receive an additional $7,500 in exchange for plaintiff's waiver and release of any and all underlying claims or claims relating to the settlement. (Dkt.# 85). Specifically, plaintiff's counsel stated on the record that he was

> waiving, setting and releasing ... *any claims arising out of the settlement* agreement or purported breach of the settlement agreement, *any claims arising out of the inspection or possession of those cars,* any claims that were raised in the litigation to enforce the settlement agreement, and any of our claims to rescind that settlement agreement.

**\*7** (Dkt. # 85, at 3)(emphasis added). Defendants' counsel reiterated that

> What has to be absolutely clear is that the *plaintiff is releasing and waiving any claim* which has been asserted in this litigation, or could have been asserted in this litigation ... and that includes any claim which could be filed in any other forum ... [and any claim]

either asserted in this action or in connection with the discussions *concerning the enforcement of the settlement agreement ... including any claims of mistake, inadvertence, excusable neglect newly discovered evidence, or fraud.*

(*Id.* at 5)(emphasis added). Plaintiff agreed on the record and thereafter executed and delivered the Release which included a release as to "any claims that the settlement was procured by mistake, inadvertence, excusable neglect, newly discovered evidence, fraud, or any other reason which otherwise could constitute a basis for [plaintiff] to seek additional relief from [defendants] relating in any manner to [defendants]." (Dkt.# 96, Exh. B). This unambiguous language evidences the parties' intent not only to voluntarily enter into the agreement, but to be bound by the terms and conditions of both the agreement and the Release.

Plaintiff now claims that "[i]n order to induce [him] to sign the Release and withdraw the District Court Action, [defendants] represented to [plaintiff] and Judge Martinez that the Porsche was 'all original', in 'excellent condition' and that 'there was no fiberglass in the bumpers.' Based on these representations upon which [plaintiff] relied, [plaintiff] signed the Release." (Dkt. # 98, at 7). Plaintiff is a self-described "individual whose hobby is collecting, trading and showing antique and classic automobiles." (Dkt. # 98, at 5). Therefore, plaintiff, a sophisticated businessman engaged in this specific line of business, cannot be excused for failing to inspect, or to have inspected, the cars he collects, purchases and trades prior to collection, purchase or trade. Moreover, this second settlement agreement, which included transfer of the Porsche, the representation of which is at issue, occurred less than one month after plaintiff learned that he had traded the title for the Delahaye for what was represented as a Shelby Mustang, worth $38,000, when, upon inspection, he learned that the car was an ordinary Ford Mustang, made to look like a real Shelby. (Dkt. # 81; *see* Dkt. # 98, at 6). Thus, despite plaintiff's assertions that defendants' claims were made in the presence of Magistrate Judge Martinez, plaintiff's reliance on defendants' representation of the Porsche was not justifiable under the circumstances. Furthermore, plaintiff, prior to his inspection of the car, then executed a clear and unambiguous release, thus contractually binding him to the terms of the agreement. Moreover, the cars being transferred as part of the settlement, were transferred "*as is, without warranty or representation.*" (Dkt. # 76, at 5). Plaintiff cannot contend otherwise. The clear and

unambiguous language used by the parties reflects their mutual assent; thus, plaintiff's decision to file a complaint in State Court is in direct breach of his contractual obligations to which he is bound by the terms of the settlement agreement and the Release.

### 2. RELEASE

**\*8** Plaintiff contends that "[f]raud in procurement of the release was not and cannot be waived," thus plaintiff's filing of a complaint in state court does not violate the terms of the Release. (Dkt. # 98, at 8)(emphasis omitted). Defendants, however, assert that the settlement, signed by plaintiff, clearly encompasses the release of claims based on fraud in inducing or procuring the settlement, thus binding plaintiff to the terms of the settlement agreement. (Dkt. # 97, at 5). The claims of the parties in this case are strikingly similar to the claims of the parties in *Nycal Corp. v. Inoco PLC*, 988 F.Supp. 296, 298 (S.D.N.Y.1997), *aff'd mem.*, 166 F.3d 1021 (2d Cir.1998). In that case, as here, defendants asserted that the "release contained in the Settlement Agreement preclude[d] [plaintiff's] claim that [he was] fraudulently induced into [the underlying agreement]", while plaintiff responded that the release, which specifically waives any claim, now or in the future, arising out of the agreement "does not extend to claims of fraudulent inducement." *Id.* The facts of this case, however, are even more compelling than those in *Nycal*, wherein the Southern District of New York concluded that while the language of the settlement agreement was facially ambiguous, extrinsic evidence of the parties' objective manifestations of intent indicated that the settlement agreement released all claims relating to the underlying agreement, including claims for fraudulent inducement. *Id.* at 299–304. In this case, the Release that plaintiff executed and delivered to defendants was unambiguous; the Release included a release

> from all claims which have or could have been asserted concerning the sufficiency, adequacy or authenticity of the consideration tendered to [plaintiff] as part of the settlement of [this case] *as well as any claims that the settlement was procured by mistake,*

> *inadvertence, excusable neglect, newly discovered evidence, fraud, or any other reason* which otherwise could constitute a basis for [plaintiff] to seek additional relief from [defendants] relating in any manner to [defendants].

(Dkt.# 96, Exh. B)(emphasis added). Moreover, because the release purports to absolve defendants for any alleged misrepresentations relating to the settlement, the timing, in this case after the entry of the stipulation of dismissal, of when plaintiff discovered the alleged fraud is irrelevant because a "release executed even without knowledge of a specific fraud effectively bars a claim or defense based on that fraud." *Sotheby's Inc. v. Dumba*, 1992 WL 27043, at *7 (S.D.N.Y. Jan. 31, 1992) (citations omitted).

Therefore, defendants' Motion to Reopen Case and Enforce Settlement (Dkt.# 96) is *granted* and the case is reopened for the limited purpose of enforcing the settlement agreement entered into on August 7, 1996.

### III. CONCLUSION

Accordingly, for the reasons stated above, defendants' Motion to Reopen Case and Enforce Settlement (Dkt.# 96) is *granted to the extent set forth above.*

**\*9** *See* 28 U.S.C. § 636(b)(written objections to ruling must be filed within ten days after service of same); FED. R. CIV. P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS*, 892 F.2d 15, 16 (2d Cir.1989)(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).

### All Citations

Not Reported in F.Supp.2d, 2003 WL 22056626

    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4240733
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Oma OPARAH, Plaintiff,
v.
THE NEW YORK CITY DEPARTMENT OF
EDUCATION, Defendant.

No. 12 Cv. 8347(JGK)(SN).
|
Signed July 10, 2015.

*MEMORANDUM OPINION & ORDER*

JOHN G. KOELTL, District Judge.

**\*1** The Court has received the Report and Recommendation of Magistrate Judge Netburn dated March 9, 2015. Magistrate Judge Netburn recommended that the Court grant the motion by defendant New York City Department of Education's motion to enforce an oral settlement agreement.

The Court has reviewed the objections of pro se plaintiff Oma Oparah and the defendant's response. The Court has considered de novo the portions of the Report and Recommendation to which the plaintiff objects. *See* Fed.R.Civ.P. 72(b). The objections are without merit, and the defendant's motion to enforce the settlement agreement should be resolved as indicated in Magistrate Judge Netburn's thorough Report and Recommendation.

The plaintiff unequivocally agreed on the record that he had settled all of his claims. July 16, 2014, Tr. at 5–6. Magistrate Judge Netburn set out the terms of the settlement and the plaintiff agreed that he understood them and accepted them. *Id.* at 5. Magistrate Judge Netburn then asked the plaintiff: "And you understand that by accepting these terms you are agreeing to be bound by the terms and you're entering an oral contract right now, do you understand that?" *Id.* at 5–6. The plaintiff responded: "Yes, I do." *Id.* at 6. There was no reservation or indication that the plaintiff did not intend to be bound by the oral agreement. *See Powell v. Omnicom,* 497 F.3d 124, 129–31 (2d Cir.2007).

The plaintiff nonetheless appears to assert three objections to the Report and Recommendation.

First, the plaintiff insists that the settlement agreement did not sufficiently compensate him for his injuries. But Magistrate Judge Netburn explained that "the terms of the settlement agreement are a payment for $100,000 in exchange for a dismissal with prejudice of *all* claims." July 14, 2014, Tr. at 4 (emphasis added). The plaintiff and his then counsel represented that they understood and consented to the settlement agreement. *Id.* at 5–6. The plaintiff cannot now revoke his consent because he had a change of heart. *See, e.g., U.S. Fire Ins. Co. v. Pierson & Smith, Inc.,* No. 06cv382, 2007 WL 4403545, at *3 (S.D.N.Y. Dec. 17, 2007) (Report and Recommendation adopted) ("Where a party has entered into an oral agreement to settle, the party cannot avoid the settlement by refusing to sign the papers that would memorialize the terms of the agreement that were reported to the court.").

Second, the plaintiff contends that he believed other terms would be memorialized in a written contract. The plaintiff, however, fails to identify what material issues were missing from the oral agreement. The plaintiff is upset that his employment records still state that he was terminated from his past position. But this argument is misplaced. The agreement did not provide for any alteration to his employment record. And thus far, the plaintiff has resisted the enforcement of the settlement agreement, and consequently the defendant was not required to provide the plaintiff a "neutral reference." July 14, 2014, Tr. at 5.

**\*2** Finally, the plaintiff appears to allege that his attorney pressured him to accept the settlement agreement. However, after listening to the plaintiff and his attorney at a February 2015 conference, the Magistrate Judge correctly rejected the argument of duress. As Magistrate Judge Netburn explained, the plaintiff's assertion is "belied by his oral acceptance on the record at the July 16, 2014 settlement conference, his inability to elaborate at the February 24, 2015 conference, and his willingness to continue with his counsel's representation if the case were to proceed." Report and Recommendation at 14.

**CONCLUSION**

Therefore, the Court adopts the Report and Recommendation. The parties are directed to comply with the terms of the settlement as set forth at the July 16, 2014, conference. This case is dismissed with prejudice in

accordance with the terms of settlement as set forth at the July 16, 2014, conference. The Court retains jurisdiction to assure that the terms of the settlement are enforced. The Clerk is **directed to enter judgment, to close this case, and to close all pending motions.** This case is subject to reopening in sixty (60) days if the parties do not complete the terms of the settlement within that time.

**SO ORDERED.**

### *REPORT AND RECOMMENDATION*

SARAH NETBURN, United States Magistrate Judge.

**TO THE HONORABLE JOHN G. KOELTL:**
On November 15, 2012, plaintiff Oma Oparah commenced this lawsuit against his former employer, the defendant New York City Department of Education (the "DOE"). Oparah alleged that he was subjected to a hostile work environment and adverse employment actions, including termination, on the basis of his age and his gender, national origin, and/or race.

On July 16, 2014, the parties appeared before me for a settlement conference, at which the parties came to an oral agreement that was memorialized on the record. After the conference, the plaintiff refused to sign the settlement agreement, claiming that he was pressured into accepting it, that he had not understood it, and that it did not fairly compensate him.

On December 12, 2014, the defendant filed a motion to compel the plaintiff to sign the settlement documents. Because I find that the parties entered into a binding and enforceable agreement on July 16, 2014, I recommend that defendant's motion to enforce the settlement be GRANTED.

### FACTUAL BACKGROUND

#### I. Statement of the Case
Oparah is a 65–year–old Nigerian man who began working at the DOE as an elementary school teacher at P.S. 49 in the Bronx, New York in 1989. He received tenure in 1992, was reassigned to the district office around 1998, and was reassigned within a month to P.S. 18, where he remained for two years. Also around 1998,

Oparah was accused of using corporal punishment. The charges against him were ultimately dismissed, but he nonetheless successfully requested transfer to P.S. 154. Oparah continued working at the DOE until 2008, when a new principal, Linda Amill–Irizarry, asked Oparah to leave his school. Oparah was removed from P.S. 154 on December 3, 2008, and placed into a reassignment center, where he remained instead of teaching for one-and-a-half years. In January 2009, the DOE sought to remove Oparah, and he was ultimately removed from the DOE payroll on June 23, 2010. On November 15, 2012, Oparah filed suit in this Court claiming violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"); Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e ("Title VII"); and N.Y.C. Admin. Code §§ 8–107, *et seq.* (the "HRL"); as well as state and federal constitutional claims. On February 22, 2013, he filed an amended complaint, claiming only violations of Title VII and the ADEA.

#### II. Settlement Conference and Subsequent Discussions
**\*3** The parties appeared at a settlement conference before me on July 16, 2014. Oparah and the DOE were both represented by counsel. On the record, both parties orally consented to a settlement agreement in which the DOE would pay Oparah $100,000, entirely allocated towards emotional harm, for dismissal with prejudice of all of Oparah's claims. Transcript of Settlement Conference, 4:22–4:25, July 16, 2014 ("1st Tr"). Oparah, meanwhile, agreed to not seek future employment from the DOE, which promised to provide him with a neutral reference, and to dismiss all of his claims with prejudice. The parties agreed that their oral agreement was binding even though a written memorialization was contemplated.

Since the conference, the plaintiff has refused to sign the settlement agreement, claiming that he was pressured into accepting it, that he had not understood it, and that it did not fairly compensate him. On August 28, 2014, the defendant moved to reopen the case, claiming that it had been unable to obtain the plaintiff's signature on the settlement documents. On October 9, 2014, Oparah failed to appear for a conference before me intended to address the current dispute. On December 12, 2014, the defendant filed a motion to compel the plaintiff to sign the settlement documents. On January 20, 2015, the plaintiff opposed the motion on the grounds stated above. On January 29, 2015, the defendant filed its reply.

On February 24, 2015, the parties appeared before me for a status conference. Oparah had several objections to signing the settlement agreement. He first said he had expected to be able to review and alter the agreement

before it was finalized. Transcript of Conference, 4:8–4:16, February 25, 2015 ("2nd Tr."). He then said that he felt the settlement the two parties had previously agreed upon did not fairly compensate him for the three years he was not paid, lost benefits or legal fees. *Id.* at 11:18–12:14 (including Oparah's statement that "I was thinking that there would be a separate issue to be discussed"); 13:4–13:11 (Oparah stating that "if I were told or if I understood that I would lose years of pay for almost one year's salary, definitely I would have said no"); 18:11–18:12 ("I never understood that I would give over all the years I didn't get paid."). Oparah also said that he felt pressured to agree to a settlement by his presence in Court and by his attorney, David Harry Rosenberg, Esq. Id at 5:21–6:3, 6:25–7:8. Later, however, Oparah said that he had gotten along well with Mr. Rosenberg and was willing to keep him as his attorney. *Id.* at 18:9–18:10 ("I absolutely have had no problem working with Mr. Rosenberg...."). Oparah said he was also upset that he was not entitled to retirement benefits he had hoped to receive, and that he thought the settlement covered only his claims for pain and suffering. "Your Honor, in every honesty, I would never have said yes if I knew I'm going to lose the years that I was not paid and all the pain and suffering I have gone [through]." *Id.* at 13:23–13:25. Oparah's lawyer stated that he believed the agreement was fair and contemplated resolution of all of Oparah's claims. Id at 14:23–15:24.

### DISCUSSION

**\*4** The question before the Court is whether Oparah made a valid, binding agreement which the defendant may enforce.

### I. Enforceability of Settlement Agreements

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *Mtgs & Exp'tns Inc. v. Tandy Corp.,* 490 F.2d 714, 717 (2d Cir.1974) (internal citations omitted). Indeed, "[s]uch power is 'especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings.' " *Omega Eng'g, Inc. v. Omega, S.A.,* 432 F.3d 437, 444 (2d Cir.2005) (quoting *Janus Films, Inc. v. Miller,* 801 F.2d 578, 583 (2d Cir.1986)).

A settlement agreement is a "contract that is interpreted according to general principles of contract law." *Omega Eng'g.,* 432 F.3d at 443. Once a court finds that parties

reached a settlement agreement, the prevailing view is that such agreement is binding on all parties, "even if a party has a change of heart between the time of the agreement ... and the time it is reduced to writing." *Elliot v. City of New York,* 11 Civ. 7291(RWS), 2012 WL 3854892, at \*2 (S.D.N.Y. Sept. 5, 2012) (quotation marks and citation omitted); *accord U.S. v. Bank of New York,* 14 F.3d 756, 759 (2d Cir.1994) ("When a party makes a deliberate, strategic choice to settle, she cannot be relieved of such a choice merely because her assessment of the consequences was incorrect." (citing *In re Master Key Antitrust Litig.,* 76 F.R.D. 460, 464 (D.Conn.1977) (citing *Ackerman v. U.S.,* 340 U.S. 193, 198 (1950) (litigants cannot be relieved of the consequences of their strategic decisions merely because hindsight indicates that a decision was wrong)))); *Omega Eng'g.,* 432 F.3d at 445 ("It is an elementary principle of contract law that a party's subsequent change of heart will not unmake a bargain already made."); *U.S. Fire Ins. Co. v. Pierson & Smith, Inc.,* 06 Civ. 382(CM)(LMS), 2007 WL 4403545, at \*3 (S.D.N.Y. Dec. 17, 2007) (where a party has entered into an agreement to settle, "the party cannot avoid the settlement by refusing to sign the papers that would memorialize the terms of the agreement that were reported to the court"); *Foster v. City of New York,* 96 Civ. 9271(PKL), 2000 WL 145927 at \*4 (S.D.N.Y. Feb. 7, 2000) ("This Court must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart."); *Rivera v. State,* 496 N.Y.S.2d 230, 230 (1st Dep't 1985) (refusing to vacate a settlement because the court found "nothing but afterthought and change of mind" (citations omitted)).

A presumption in favor of enforcement reflects the value that courts place on negotiated settlement agreements. *Willgerodt v. Hohri,* 953 F.Supp. 557, 560 (S.D.N.Y.1997) ("Settlement agreements are strongly favored in New York and may not be lightly cast aside."), *aff'd sub nom. Majority Peoples' Fund for 21st Century, Inc. v. Hohri,* 159 F.3d 1347 (2d Cir.1998); *Hallock v. State,* 474 N.E.2d 1178, 1178 (N.Y.1984). It is also consistent with basic contract principles, which maintain that reformation of a settlement agreement is an extraordinary remedy. 27 Richard A. Lord, Williston on Contracts § 70:33 (4th ed.2012) (reformation is appropriate only to correct a material, mutual mistake); *Beecher v. Able,* 441 F.Supp. 426, 429–30 (S.D.N.Y.1977).

**\*5** Mutual assent of the parties to the terms of a settlement is the essential component of a settlement agreement. *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 427 (2d Cir.2004) (" '[M]utual assent is essential to the formation of a contract and a party cannot be held to

have contracted if there was no assent or acceptance." (citing *Maffea v. Ippolito,* 247 A.D.2d 366, 367 (2d Dep't 1998)). While a written document is the most traditional evidence of mutual assent, parties may enter and be bound by an agreement without signing a fully executed contract. *Winston v. Mediafare Entm't Corp.,* 777 F.2d 78 (2d Cir.1986); *Bonnette v. Long Island Coll. Hosp.,* 819 N.E.2d 206, 208 n. 2 (N.Y.2004) (recognizing that the court may enforce a settlement agreement that is not reduced to writing). "Preliminary agreements" that address all negotiated terms are enforceable, even if they are oral, *Ciaramella v. Reader's Digest Ass'n, Inc.,* 131 F.3d 320, 322 (2d Cir.1997), or written in an email, *Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC,* 04 Civ. 1621(KMW)(AJP), 2005 WL 1377853 (S.D.N.Y. June 9, 2005), and even if they contemplate a subsequent memorialization in an executed document, *Teachers Ins. & Annuity Ass'n v. Tribune Co.,* 670 F.Supp. 491, 498 (S.D.N.Y.1987).

Where there is no final document on which to rely, the controlling factor in determining whether parties are bound by an agreement is whether a court has evidence of the parties' intent to be bound. *Powell v. Omnicom,* 497 F.3d 124, 129 (2d Cir.2007); *Winston,* 777 F.2d at 80. Because a court cannot decipher the "secret or subjective intent" of the parties, "it is the objective intent ... that controls." *Klos v. Polskie Linie Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997); *accord* 22 N.Y. Jur.2d, Contracts § 29 (2013) ("In the formation of a contract, only the overt acts of the parties may be considered in determining mutual assent.").

This Circuit has not resolved the question of whether a district court should apply federal or state law to decide a motion to enforce a settlement, where the jurisdiction of the district court rests on a federal question. *See, e.g., Powell,* 497 F.3d at 129 n. 1; *Ciaramella,* 131 F.3d at 322 n. 1. In *Ciaramella,* however, the Court of Appeals noted that there was "no material difference" between New York law and federal common law on this issue. *See Ciaramella,* 131 F.3d at 322. *See also Figueroa v. New York City Dep't of Sanitation,* 475 F. App'x 365, 366 (2d Cir. Apr. 12, 2012) (recognizing that "the question of whether federal or state law controls the enforceability of a settlement agreement in this context is an open one" and declining to decide that question). The majority of district courts have applied only federal common law in federal question cases when a motion is filed to enforce an oral settlement agreement. *See, e.g., Pierre v. Chase Inv. Servs Corp.,* 10 Civ. 1740(SAS), 2013 WL 709055 (S.D.N.Y. Feb. 25, 2013), *reconsideration denied,* 2013 WL 1287330 (S.D.N.Y. Mar. 28, 2013), *aff'd,* 561 F. App'x 71 (2d Cir.2014); *Alvarez v. City of New York,* 146

F.Supp.2d 327, 335 n. 6 (S.D.N . Y.2001). Because the Court of Appeals has not definitively ruled on the issue, this report will examine both sources.

### A. Federal Common Law
**\*6** The Court of Appeals for the Second Circuit has adopted a four-factor test to evaluate disputes around parties' settlement intentions in the absence of a formalized writing. Courts consider whether: (1) there has been an express reservation of the right not to be bound in the absence of a writing; (2) there has been partial performance of the contract; (3) all of the terms of the alleged contract have been agreed upon; and (4) the agreement at issue is the type of contract that is usually committed to writing." *Winston,* 777 F.2d at 80. The factors "may be shown by oral testimony or by correspondence or other preliminary or partially complete writings." *Id.* at 81 (internal quotation marks and citation omitted). No single factor is dispositive. *Ciaramella,* 131 F.3d at 323.

### (1) Express reservation
There is no evidence of an express reservation of the right not to be bound until the parties signed a written document memorializing their verbal settlement agreement. At the July 16, 2014 settlement conference, both parties agreed on the record to the terms, which included that the oral contract would be enforceable notwithstanding the possibility of a written memorialization.

Although the parties contemplated that the terms of their agreement would be reduced to writing, that alone does not preclude enforcement under the oral agreement. *Shape CD, Ltd. v. Quiksilver, Inc.,* 07 Civ.2033(PKC), 2008 WL 2009668, at \*2 (S.D.N .Y. May 6, 2008) ("The absence of a fully executed settlement agreement need not be fatal to enforcement, even if one were originally contemplated by the parties." (citing *Winston,* 777 F .2d at 78)). Accordingly, the first *Winston* factor weighs strongly in favor of enforcement.

### (2) Partial performance
Actions (or the lack thereof) taken after the July 16, 2014 settlement conference suggest that the parties understood that the case was settled.

The defendant claims—and Oparah does not deny—that following the conference, on July 23, 2014, the DOE sent

settlement documents to Oparah. Counsel for both parties discussed the documents and agreed to a final version of them on July 28, 2014, but Oparah was unable to sign them at the time due to surgery. After Oparah's attorney represented that Oparah was still unable to sign the documents on August 20, 2014, the DOE moved to reopen the case on August 28, 2014. This led to proceedings before the Hon. John G. Koeltl and before me, as well as the present motion.

Although the settlement papers were drafted, there is only slight evidence that anyone performed under its terms or that such performance was accepted. The parties ceased litigating after the settlement conference, and neither party filed a motion for summary judgment, which was otherwise anticipated if no settlement had been reached at the conference. Accordingly, this factor weighs slightly toward enforcing the agreement. *See Jackson v. New York City Dep't of Educ.,* 10 Civ. 9193(DLC), 2012 WL 1986593 (S.D.N.Y. June 4, 2012) (citing *U.S. v. U.S. Currency in the Sum of Six Hundred Sixty Thousand, Two Hundred Dollars ($660,200.00), More or Less,* 423 F.Supp.2d 14, 28–29 (E.D.N.Y.2006) (drafting and delivering settlement documents constitutes partial performance)).

**(3) Remaining material terms to negotiate**
**\*7** The third *Winston* factor examines whether all of the terms of the alleged contract were agreed upon. This factor favors enforcement.

Oparah's oral acceptance of the terms of the settlement at the July 16, 2014 conference contained all material terms: the DOE's agreement to pay Oparah $100,000 and to provide Oparah with a neutral letter of reference; and Oparah's agreement to dismiss all of his claims with prejudice and to not to seek future employment with the DOE. These terms are all properly reflected in the settlement materials prepared by the DOE.

In his opposition, Oparah claims that the settlement does not address the discrimination he faced while an employee of the DOE, years of missed pay after he was removed, lost retirement benefits, health consequences that came as a result of those issues, or money he claims the DOE improperly recouped from his bank account. Oparah does not, however, address the clear statement in the transcript that he agreed to settle all of his claims other than to say that he was "pressured into accepting the agreement orally." Pl.'s Oppo. ¶ 1. Oparah was represented by counsel at the July 16, 2014 settlement conference. Asked at the February 24, 2015 hearing about his claim of undue pressure, Oparah could not articulate

any particular pressures he faced during the settlement, but rather expressed alternately that either he felt he had not properly understood the agreement at the time of apparent acceptance or that he was not satisfied with how it compensated him. Oparah has not identified any material terms that were excluded from the agreement or any terms that were left to negotiate. This is enough to convince the Court that, as of July 16, 2014, no material terms remained to be negotiated. *See Hostcentric,* 2005 WL 1377853, at \*8 (holding that emails between counsel stating all material terms of an agreement and an acceptance of them constituted a binding contract, despite the subsequent breakdown of negotiations).

Moreover, the terms of the agreement were communicated to the Court on the record in the July 16, 2014 settlement conference. Indeed, the Court relied on this representation when it reported to Judge Koeltl that the case had been settled, and he relied on that representation when he issued his July 31, 2014 Order that the case be dismissed because the parties had settled. (Docket No. 55.) *See Jackson,* 2012 WL 1986593, at \*3 ("most significantly, [the parties] communicated the settlement to the Court"). This further supports the conclusion that there were no terms left to negotiate as of July 16, 2014.

**(4) Usual form of agreement**
The fourth *Winston* factor considers "whether the agreement at issue is the type of contract that is usually committed to writing." This factor weighs lightly in favor of enforcement. The agreement here does not approach the length or complexity of those frequently considered to require a writing. *See, e.g., Ciaramella,* 131 F.3d at 326 (finding that an eleven-page settlement agreement that included terms that would apply in perpetuity required a writing); *Winston,* 777 F.2d at 83 (finding that a four-page agreement for $62,500 with a payment plan spanning years was sufficiently complex to require a writing). There was no discussion of a payment plan and the proposed memorialization of the terms is a short, standard settlement agreement from the New York City Law Department, which represents the DOE, containing a settlement of all claims against the DOE and New York City and the aforementioned terms. Thus, although most settlement agreements in this Court are written, there is nothing complicated about this agreement that would require strict adherence to that tradition.

**\*8** Even if the Court were to find that a settlement agreement of this nature is normally reduced to writing, several considerations justify the Court's confidence in the parties' intent to be bound by the oral agreement. The

terms of the agreement were discussed with me during the July 16, 2014 settlement conference, and counsel for both parties negotiated the terms, coming to a final proposed agreement. Oparah was not expected to counter-offer and, in fact, did not propose alternative terms.

The oral agreement on the record is therefore akin to an in-court acceptance of the terms.[1] *Pierre,* 2013 WL 709055, at *5 (an in-court announcement can function as a memorializing writing); *Lopez v. City of New York,* 242 F.Supp.2d 392, 394 (S.D.N.Y.2003) (holding in part that "although this is the type of contract normally reduced to writing, the agreement on [the] record in open court counts as a writing"). *See Omega Eng'g.,* 432 F.3d at 444 (trial court's inherent power to enforce a settlement agreement is ' "especially clear where the settlement is reported to the court during ... significant courtroom proceedings' " (citation omitted)).

[1]     And arguably Judge Koeltl's July 31, 2014 Order of Discontinuance is the equivalent of the Court soordering the settlement.

Additionally, there is a written representation of the oral agreement in the form of the subsequently provided settlement papers. Therefore, there is no need to rely on oral representations. *See Hostcentric,* 2005 WL 1377853, at *10 ("[T]he Court notes that even if one were to find that this type of agreement should be in writing, it was—the parties were not dealing with an oral agreement but one written in an email from [defendant] and accepted by an email from [plaintiff].").

Thus, although settlement agreements are generally reduced to writing, several considerations favor a finding that the settlement of this case need not have been so memorialized.

In sum, the first and third *Winston* factors strongly favor enforcement, and the second and fourth factors also favor enforcement, though less forcefully. Based on this, I find that the oral statements on the record at the July 16, 2014 settlement conference constitute a binding agreement under federal common law.

### B. New York Law
The Court of Appeals for the Second Circuit has found that federal law and New York law are "materially indistinguishable" with regard to the enforceability of oral settlement agreements and has applied New York and federal common law "interchangeably." *Powell,* 497 F.3d at 129 n. 1 (citing *Ciaramella,* 131 F.3d at 322). *See also Monaghan v. SZS 33 Assocs.,* 73 F.3d 1276, 1283 n .3 (2d Cir.1996). Nevertheless, the Court assesses this matter here under the language of New York's CPLR 2104 ("Rule 2104"), which states:

> An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.

**\*9** Rule 2104 contemplates that "open court" announcements of settlement are exempt from the writing requirement to enforce an agreement. Thus, the New York Court of Appeals has left open the possibility that a court may enforce a settlement agreement that does not comply with the writing requirements of Rule 2104. *See Bonnette,* 819 N.E.2d at 208 ("If there are rare occasions when [certain] doctrines can permit enforcement of a settlement agreement where the literal terms of CPLR 2104 are not satisfied (a question which we do not decide), this is not one of them."). *See also Winston,* 777 F.2d at 80 ("Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document."). Given the facts here—namely the court—supervised settlement and the recitation and acceptance of settlement terms on the record and in open court—I find that this matter is within the narrow category of cases to which Rule 2014's writing requirement need not apply. *See Figueroa,* 475 F. App'x at 367 (concluding that the case is "one of those rare occasions" where Rule 2104 permits enforcement of the settlement agreement despite the absence of a writing (internal quotation marks and citation omitted)).

Therefore, I find that, under both federal common law and New York law, the parties entered into a binding and enforceable settlement agreement at the July 16, 2014 settlement conference.

### II. Whether the Settlement Agreement Binds Oma Oparah

#### A. Enforceability
To show that a contract was validly executed under New York law, a party seeking enforcement must show that there was an offer, acceptance, consideration, mutual assent, and the intent to be bound by the contract. *See*

*Register.com, Inc,* 356 F.3d at 427. "[A] party cannot be held to have contracted if there was no assent or acceptance." *Id.*

Here, Oparah attended the July 16, 2014 settlement conference, where he was represented by counsel and agreed on the record to be bound by the terms of the agreement. Citing no case law, the plaintiff now argues that he was "pressured into accepting the agreement," and that now, upon consideration, he has changed his mind. Pl.'s Oppo. ¶ 1. The defendant's filings and the settlement conference transcript, however, make it clear that all of the elements necessary for enforcement have been established. The parties made and accepted offers at the settlement conference. Both sides received consideration under the agreement; Oparah would receive $100,000 and a neutral letter of reference, while the DOE would receive promises that Oparah would dismiss his claims and desist from seeking employment with the department. Both parties mutually assented, on the record, to the terms and to be bound by the contract. Accordingly, the settlement agreement was a contract that was validly executed under New York law.

### B. Mistake or Fraud

Finally, were Oparah to have demonstrated that he was induced into accepting the settlement agreement through mistake or fraud, the Court would refuse to enforce its terms. But Oparah has not offered any evidence of mistake or fraud stemming from the July 16, 2014 settlement conference or his subsequent communications with counsel beyond a bare, conclusory statement that he was "pressured" that is belied by his oral acceptance on the record at the July 16, 2014 settlement conference, his

inability to elaborate at the February 24, 2015 conference, and his willingness to continue with his counsel's representation if the case were to proceed.

**\*10** In the absence of sufficient contrary evidence, Oparah's refusal to accept the terms of the agreement is best described as a "change of heart," which is firmly disfavored as a ground for reformation or rescission of a binding agreement. *Foster,* 2000 WL 145927 at \*4. *See also Willgerodt,* 953 F.Supp. at 560. Accordingly, the Court finds no basis on which to relieve Oparah from the terms of the July 16, 2014 settlement agreement.

### CONCLUSION

For the reasons discussed above, I recommend that the defendant's Motion to Enforce the Settlement Agreement be GRANTED.

The terms of the settlement agreement should remain those represented on the record on July 16, 2014, and set forth in the transcript.

### SO ORDERED.

Filed March 9, 2015.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 4240733

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.